IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:16-CV-00015-D

**Cheryl Denise Thomas,**

                    Plaintiff,

v.

**Nancy A. Berryhill**, Acting
Commissioner of Social Security,[1]

                    Defendant.

**Memorandum & Recommendation**

        Plaintiff Cheryl Denise Thomas instituted this action on February 8, 2016, to challenge the denial of her application for social security income. Thomas claims that the Administrative Law Judge ("ALJ") Mark C. Ziercher erred in weighing the medical opinion evidence and in evaluating her credibility. Both Thomas and Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 14, 16.

        After reviewing the parties' arguments, the court has determined that ALJ Ziercher erred in reaching his decision. ALJ Ziercher did not properly consider the medical opinion evidence and his evaluation of Thomas's credibility is flawed. Therefore, the undersigned magistrate judge recommends that the court grant Thomas's motion, deny Berryhill's motion, and remand the matter to the Commissioner for further consideration.[2]

---

[1] Berryhill replaced Carolyn Colvin as the Acting Commissioner of Social Security on January 20, 2017.

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

# I.  Background

On December 2, 2013, Thomas protectively filed applications for disability benefits and supplemental security income. In both applications, she alleged a disability that began on October 1, 2013. After her claims were denied at the initial level and upon reconsideration, Thomas appeared by video-conference before an ALJ Ziercher on February 2, 2015 for a hearing to determine whether she was entitled to benefits. ALJ Ziercher determined determined Thomas was not entitled to benefits because she was not disabled. Tr. at 15–29.

ALJ Ziercher found that Thomas had the following severe impairments: asthma, bipolar disorder, poly substance addiction disorder, and post-traumatic stress disorder ("PTSD"). *Id.* at 18. ALJ Ziercher found that Thomas's impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* ALJ Ziercher then determined that Thomas had the RFC to perform a full range of work at all exertional levels with limitations. *Id.* at 20. She is limited to indoor work. *Id.* She can perform goal-oriented rather than production-oriented work (the performance of work tasks in allotted time is more important than the pace at which the work tasks are performed). *Id.* Thomas can understand, remember, and perform work tasks at a GED Reasoning Level 03 (as defined in the Dictionary of Occupational titles). *Id.* She can perform work that involves routine tasks (i.e., no more than frequent changes in core work duties). *Id.* Thomas can also perform work in which independent goal setting or planning occurs no more than frequently. *Id.* Finally, she can have occasional contact with the general public and frequent contact with coworkers. *Id.*

ALJ Ziercher concluded that Thomas was incapable of performing her past relevant work as a nurse. *Id.* at 26. However, considering her age, education, work experience, and RFC, ALJ Ziercher found that there were other jobs that existed in significant numbers in the national

economy that Thomas was capable of performing. *Id.* at 27–28. These include: marketer, router, and shirt presser. *Id.* Thus, ALJ Ziercher found that Thomas was not disabled. *Id.* at 28–29.

After unsuccessfully seeking review by the Appeals Council, Thomas commenced this action by filing a complaint on February 8, 2016. D.E. 1.

## II.     Analysis

### A.     Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B.     Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson* v. *Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is

equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Background[3]

The medical evidence reveals the following: Thomas established primary care at Pamlico Community Health Center in September 2013. Tr. at 379. She described her mental condition as chronic, worsening anxiety, and poor sleep. *Id.* Providers diagnosed anxiety and prescribed medication. *Id.* At a follow-up appointment, Thomas reported anxiety, depression, disturbed sleep, decreased interest, and decreased energy. *Id.* at 385. Providers diagnosed her with anxiety and depression and directed Thomas to limit her exposure to emotional distress. *Id.* Thomas received a referral for a psychiatric consultation. *Id.*

On January 16, 2014, Catherine A. Gneiting, Ph.D., evaluated Thomas for mental health care. *Id.* at 349–65. Thomas reported anxiety, depression, anger outbursts, and addiction. She also stated that she had difficulty sleeping and maintaining concentration. Dr. Gneiting remarked that Thomas appeared to be under the influence of an intoxicating substance. *Id.* at 352. Dr. Gneiting diagnosed bipolar disorder, PTSD, and dependence on alcohol, cocaine, and cannabis. *Id.* at 365.

---

[3] The parties do not dispute the medical evidence regarding Thomas's physical conditions. Accordingly, the court has limited a summary of the medical evidence to her mental impairments.

Dr. Gneiting completed a Psychiatric/Psychological Impairment Questionnaire in which she diagnosed bipolar disorder, most recent episode depressed. *Id.* at 370–76. She stated that, since 2013, Thomas had experienced sleep disturbance, mood disturbance, emotional lability, substance dependence, and hostility. *Id.* at 371, 376.

Dr. Gneiting opined that Thomas was markedly limited in her abilities in the following respects: performing activities within a schedule, maintaining regular attendance, and being punctual with customary tolerances, sustaining an ordinary routine without workplace supervision, making simple work-related decisions, completing a normal workweek without interruptions from psychologically based symptoms, performing at a consistent pace without unreasonable rest periods, asking simple questions and requesting assistance, accepting instructions and responding appropriately to criticism, maintaining socially appropriate behavior and cleanliness, and responding appropriately to changes in the workplace. *Id.* at 373–74. Dr. Gneiting also found Thomas was moderately limited as follows: understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, working in coordination or proximity to others without distraction, interacting appropriately with the general public, getting along with coworkers or peers, being aware of normal hazards and taking normal precautions, and setting realistic goals or making plans independently. *Id.* Dr. Gneiting found that Thomas experienced episodes of deterioration or decompensation as her depression and anxiety increased and she was unable to care for herself. *Id.* at 364. Dr. Gneiting opined that Thomas could not tolerate even low stress and that she would likely be absent from work three or more days per month. *Id.* at 375–76.

Robert Seigel, N.P., performed a psychiatric evaluation of Thomas in March 2014. *Id.* at 445–56. Noting moodiness with manic phases, depression, irritability, impulsivity, and anxiety,

Seigel diagnosed Thomas with bipolar disorder, depressive disorder, anxiety disorder, and polysubstance abuse. *Id.* at 448–49. He prescribed medications. *Id.* at 449.

In June 2014, Lisa Dawson, MSW, LCSW, completed a Mental Impairment Questionnaire noting signs of irritable mood, hostility, manic syndrome, difficulty thinking or concentrating, anxiety, and insomnia. *Id.* at 1161–65. Dawson stated that Thomas's severe manic symptoms were her most frequent symptom and resulted in difficulty engaging in treatment. *Id.* at 1163. Dawson concluded that Thomas suffered periods of decompensation because of manic and depressive symptoms. *Id.*

Dawson opined that Thomas had marked limitations as follows: ability to maintain concentration and attention, complete a normal workday, and perform at a consistent pace. *Id.* at 1164. She also found Thomas to have moderate limitations in her ability to carry out detailed instructions, to perform within a schedule, and be punctual. *Id.* Dawson also opined that Thomas would be absent from work three or more times per month.

Thomas presented to Carolina East Medical Center on July 23, 2014 for treatment of multiple contusions and abrasions. *Id.* at 491. Emergency Department records indicate that her injuries may have been self-inflicted. *Id.* Thomas received an involuntary committal to the hospital as she expressed homicidal ideations. *Id.* at 493. Dr. Charles Godwin examined Thomas the next day. *Id.* at 547–54. Her initial irritability calmed over the course of the evaluation. *Id.* at 552. Mental status exam revealed impaired attention and concentration, easy distractibility, angry and argumentative affect, evasive thought process, paranoid and homicidal thought content, and poor judgment. *Id.* Dr. Godwin diagnosed bipolar disorder with psychotic features and polysubstance abuse. *Id.* at 554. He recommended admission to a dual treatment facility and prescribed medications. *Id.* at 547.

6

Thomas transferred to Cherry Hospital on July 25, 2014 for treatment related to her cocaine use. *Id.* at 677. Thomas participated in substance abuse groups and received diagnoses of bipolar disorder and cocaine dependence. *Id.* at 687. Upon discharge on July 30, 2014, Thomas received a transfer to Walter B. Jones ADATC for drug treatment. *Id.* at 678–79.

Dr. Bryan T. Smith evaluated Thomas and noted previous diagnoses of depression, anxiety, bipolar disorder, and PTSD. *Id.* at 915. He assessed PTSD and depression secondary to polysubstance dependence and he prescribed medications. *Id.* at 916–17. An evaluation by Gary C. Robertson, M.S., noted pressured speech and poor coping skills. *Id.* at 794. Thomas's treatment notes through August 7, 2014, observed distorted perceptions of reality, difficulty focusing, psychiatric instability, and difficulty carry on a conversation without irrational thinking, impulsivity, and aggression. *Id.* at 783.

Because of her disruptive behavior, Walter B. Jones transferred Thomas to Cherry Hospital on August 7, 2014. *Id.* at 681. Her diagnoses at that time included bipolar disorder, cocaine abuse, and cannabis abuse. *Id.* at 682. Providers adjusted her medications. Providers assessed Thomas's prognosis as guarded upon her discharge on August 14, 2014. *Id.* at 683–84.

Lisa Gavin, LSW, evaluated Thomas on August 19, 2014. *Id.* at 1115–20. She observed that Thomas had been hospitalized for three weeks for psychiatric and substance abuse issues. *Id.* at 1115. Thomas acknowledged using alcohol and cocaine the day before the evaluation. *Id.* Gavin diagnosed substance abuse disorders and bipolar disorders, for which she recommended medication and substance abuse treatment. *Id.* at 1120.

At a follow-up visit to Siegel later that month, he diagnosed Thomas with bipolar disorder, anxiety disorder, and alcohol/stimulant related disorder. *Id.* at 1125. He prescribed

medications. *Id.* Thomas returned in September 2014 and Seigel adjusted her medications. *Id.* at 1137, 1140.

On October 21, 2014, Dr. Vivek Anand saw Thomas and adjusted her medication regimen. *Id.* at 1241. Dr. Anand completed a Mental Impairment Questionnaire on January 20, 2015. *Id.* at 1166–74. He noted clinical signs included depressed mood, generalized anxiety, hostility, manic syndrome, difficulty concentrating, and insomnia. *Id.* at 1168. He found that Thomas experienced episodes of decompensation as she had difficulties in normal activities. *Id.* at 1169. He also opined that these symptoms were present since October 1, 2013. *Id.* at 1171.

Dr. Anand assessed Thomas had the following marked limitations: remembering locations and work-like procedures; understanding, remembering, and carrying out simple instructions; maintaining concentration and attention; performing on a schedule and being punctual; sustaining an ordinary routine without supervision; working with or near others without distraction; making work-related decisions; completing a normal workday; performing at a consistent pace; accepting instruction and responding appropriately to criticism; getting along with coworkers and peers without distraction; and responding appropriately to workplace changes. *Id.* at 1170. He further opined that she was likely to be absent three or more times per month and that her bipolar and PTSD made it unsafe for her to work at any job. *Id.* at 1171.

In a January 20, 2015 letter, Dr. Anand noted that Thomas previously saw another psychiatrist from January 2014 through June 2014, she had an involuntary commitment to Cherry Hospital, she had a history of polysubstance abuse for which she had received inpatient and outpatient treatment, and that she continued to experience manic symptoms, easy distractibility, and paranoid thinking. *Id.* at 1173. Dr. Anand opined that substance abuse was not the cause of Thomas's problems. *Id.* He reported that some of Thomas's medications were

discontinued due to side effects she experienced. *Id.* at 1174. Dr. Anand opined that even minimal increases in mental demands or changes in environment would cause her to decompensate. *Id.* He found that her prognosis was poor. *Id.*

### D.    Medical Opinion Evidence

Thomas first argues that ALJ Ziercher erred in evaluating the medical opinion evidence and, specifically, the assessment offered by her treating physician, Dr. Anand. The Commissioner asserts that ALJ Ziercher properly considered this evidence. The court finds that ALJ Ziercher's proffered reasons for the weight assigned to the opinion evidence lack support in the record.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527. While an ALJ is under no obligation to accept any medical opinion, *see Wireman* v. *Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), he must nevertheless explain the weight accorded such opinions. *See* SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96–6p, 1996 WL 374180, at *1 (July 2, 1996). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally* v. *Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(c). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his

opinion is given. *See id.* § 404.1527(c)(3). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See id.* § 404.1527(c)(4).

According to 20 C.F.R. § 404.1527(c)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro* v. *Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also Craig* v. *Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(d)(1).

ALJ Ziercher gave little weight to Dr. Anand's assessment that found, among other things, that Thomas had marked limitations in accepting and following instructions, maintaining concentration and attention, working with others, and making work-related decisions. Tr. at 1170. ALJ stated that Dr. Ziercher had limited contact with Thomas, as he first examined her in October 2014, some three months before his assessment. *Id.* at 24. ALJ Ziercher also concluded that he expected to see more episodes of decompensation if Thomas's mental impairments were marked as Dr. Anand found. *Id.*[4]

---

[4] ALJ Ziercher stated that Dr. Anand failed to explore how Thomas's substance use aggravated her mental health symptoms. Tr. at 24. However, it appears that Dr. Anand only treated Thomas during sobriety and, therefore, it is difficult to understand how he could evaluate the impact substance use had on her mental health symptoms when she was abstaining from use.

In reviewing the record, the undersigned notes first that it seems contradictory to cite a limited treatment relationship as a factor supporting assigning less weight to the assessment offered when ALJ Ziercher afforded significant weight to State disability program consultants, W.W. Albertson, Ed.D., and Betty B. Aldridge, Psy.D., who had no treatment relationship with Thomas and did not examine her. Instead, they based their evaluations on a review of the medical records. *Id.* at 26. In this matter, even if there were limited contact[5] between Thomas and Dr. Anand, it does not provide a valid basis for discounting Dr. Anand's opinion in favor of the opinions of Drs. Albertson and Aldridge, who had no contact with her. *See Chapo* v. *Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (ALJ's justification for effectively rejecting a treating physician's unopposed findings as to the claimant's mental residual functional capacity, that the physician "had been in a professional relationship with [the claimant] for merely two months," was insufficient; while that justification may have been a valid reason not to accord the physician's findings the conclusive weight of a treating medical-source opinion, that just effectively reduced them to the status of an examining-source opinion and was not by itself a basis for rejecting them); *Lester* v. *Chater*, 81 F.3d 821, 832 (9th Cir. 1995), *as amended* (Apr. 9, 1996) (ALJ's finding that physician had "limited observation" of the claimant was not a valid reason to give preference to the opinion of a doctor who has never examined the claimant).

ALJ Ziercher also reasoned that the opinions of Drs. Albertson and Aldridge deserved significant weight because they were expert opinions which generally "are entitled to considerable deference when they are supported by the record." Tr. at 25; 20 C.F.R. § 404.1527(e)(2). ALJ Ziercher noted, however, that these reviewers did not have the benefit of the

---

[5] At the time of Dr. Anand's assessment, Thomas had seen him approximately every three weeks since October 21, 2014. The court need not decide whether this constitutes limited contact between a patient and physician.

full record when they offered their opinions. *Id.* Evidence generated since these reviewers examined the record is substantial. Indeed, their assessments in February 2014 and May 2014 did not consider Thomas's involuntary committal, three week hospital stay, substance abuse treatment, and mental health care from the majority of 2014. Without the consideration of the substantial medical record produced subsequent to their reviews, it is difficult to find that their opinions accurately assess Thomas's mental health condition during the relevant time period.

Moreover, as a board certified psychiatrist, Dr. Anand's opinion would similarly qualify as an expert opinion due considerable deference if supported by the record. *Id.* at § 404.1527(c); *Garcia* v. *Colvin*, No. CV 12–06542-MAN, 2014 WL 358396, at *3 (C.D. Cal. Jan. 30, 2014) (noting that "[b]oard certification is recognized as a 'marker of a physician's professionalism, knowledge and skill'" and that "a physician's board certification or specialization may be a basis to accord additional weight to that physician's opinion.") (citation omitted). Accordingly, "expertise" is not a valid basis for affording the opinions of Drs. Albertson and Aldridge more weight than that of Dr. Anand.

Importantly, although Dr. Anand's treatment relationship with Thomas began only a few months before he offered his assessment, his findings are consistent with the other substantial evidence of the longitudinal record. For example, ALJ Ziercher noted that in August 2014, Thomas reported Zoloft helped a lot, and she was eating and sleeping well. Tr. at 24. However, these records also reflect Thomas's diagnoses were bipolar disorder, anxiety disorder, and substance abuse disorder. *Id.* at 1129. She reported last using cocaine three says earlier. *Id.* at 1128. She complained of tremors and daytime sedation. *Id.* She reported that she experienced manic phases, sleep deficits up to three days (the last of which occurred the previous month),

anxiety not induced by drug activity, depression, irritability, and anger outbursts. *Id.* Thomas reported improvement with medications and therapy. *Id.* Her insight was deemed poor. *Id.*

ALJ Ziercher noted, too, that treatment notes from September 2014 indicated that Thomas was feeling well and her mental status exam was within normal limits. *Id.* at 24. These notes, two weeks after her previous treatment, also reflect that she was experiencing sleep disturbance and irritability and was again found to have poor insight. *Id.* at 1143. She continued to have diagnoses of bipolar disorder, anxiety disorder, and polysubstance abuse disorder *Id.* at 1138. Notes reflect that Thomas reported experiencing manic phases as well as anxiety, racing thoughts, depression, irritability, sleep problems, and loses her temper. *Id.* Although she reported some improvement, she was still symptomatic. *Id.*

Dr. Anand's opinion is also bolstered by the records of Seigel whose records demonstrate that Thomas was experiencing moodiness, excess energy, an inability to sleep, depression irritability, and anger outbursts. *Id.* at 447–48. She had poor insight and her symptoms of mania, depression, and anxiety were ongoing. *Id.* at 1122–23. Subsequent records also reflect continuing complaints of irritability, moodiness, and sleep issues. *Id.* at 1137, 1140. Dr. Anand's opinion is also consistent with Gavin's treatment records, which note impaired judgment and diagnosed bipolar disorders and polysubstance abuse disorder. *Id.* at 1119–20.

Dr. Anand's opinion finds further support in Dawson's assessment. The assessment noted that Thomas had recently been experiencing severe manic symptoms. *Id.* at 1163. Dawson noted irritable mood, hostility, manic syndrome, difficulty thinking or concentrating, and insomnia. *Id.* at 1162. She opined that Thomas had marked limitations in attention and concentration as well as moderate to marked limitations in following instructions and maintaining a schedule. *Id.* at 1164–65. Dawson stated that her manic and depressive symptoms would prevent productive and

safe work. *Id.* at 1163, 1165. Dawson also noted Thomas was engaged in treatment for both bipolar disorder and substance addiction with a fair prognosis. *Id.* at 1165.

ALJ Ziercher discounted Dawson's opinion, reasoning that she was "not eligible to make a medical source statement because she is not a SSA accepted treating healthcare provider." *Id.* at 25. He further remarked that this provider had limited contact with Thomas and her check-box review offered little meaningful rationale or support. *Id.* These proffered reasons fail to discredit Dawson's observations.

The Regulations require an ALJ to consider all medical evidence, regardless of its source. 20 C.F.R. § 404.1513; SSR 06–39 at *4 (the regulations require an ALJ to consider evidence, including opinions, from "other sources."). While providers such as Dawson, a licensed clinical social worker, are not considered "acceptable medical sources," the Regulations advise that evidence from "other sources," including social workers, may be used to show impairment severity and its impact on an ability to work. *Id.* at § 1513(d); SSR 06–3p, 2006 WL 2329939, at *3 (noting that opinions from health care providers who are not acceptable medical sources, including licensed clinical social workers, "are important and should be evaluated on key issues such as impairment severity and functional effects").

While ALJ Ziercher was not required to accept Dawson's assessment, her lack of status as an "acceptable medical source" is not a basis to discredit her records and findings altogether as they offer additional insight into Thomas's status. *Bonnell* v. *Astrue*, 650 F. Supp. 2d 948 (D. Neb. 2009) (the opinions of licensed clinical social workers are important and should be evaluated on key issues, such as impairment severity and functional effects). Thus, although it may not establish the existence of a medically determinable impairment or constitute a medical

opinion, Dawson's assessment is nonetheless relevant because offers a broader understanding of Thomas's functioning and limitations and provides support for Dr. Anand's opinions.

Additionally, the court recognizes check box or fill in the blank forms are weak evidence. *Mason* v. *Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). However, such a form may import greater significance when it is supported by medical records. *See Garrison* v. *Colvin*, 759 F.3d 995 (9th Cir. 2014) ("[O]pinions expressed in check-box form [by the treating source] were based on significant experience with [the claimant] and supported by numerous records, and were therefore entitled to weight that an otherwise unsupported and unexplained check-box form would not merit."); *Larson* v. *Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (substantial evidence did not support ALJ's decision to reject treating physician's "check box" opinion where the opinion was supported by clinical evidence, including the physician's own treatment notes, and was not inconsistent with other evidence in the record); *Moore* v. *Astrue*, No. C 07–1218 PJH, 2008 WL 2811983, at *8 (N.D. Cal. July 21, 2008) (rejecting proposition that an ALJ may reject a physician's opinion simply because it is in checkbox form as such an explanation failed to provide an adequate reason for rejecting a physician's opinion).

Dawson's review is contained on a form with check boxes, but Dawson also provided additional notations regarding Thomas's treatment and status. *Id.* at 1161–65. Moreover, check-boxes forms are regularly used by both providers and consultants in the disability determination process. *See Stancato* v. *Comm'r of Soc. Sec.*, No. 5:13 CV 1519, 2014 WL 4792560, at *6 (N.D. Ohio Sept. 24, 2014) (noting that check-box forms are routinely used by state agency reviewers). Thus, the format alone is not a reasonable basis to dismiss Dawson's assessment.

Additionally, although ALJ Ziercher cited Dawson's limited contact with Thomas, her records reflect she began treating Thomas on April 1, 2014, and saw her on a biweekly basis

through June 2014. Tr. at 1161–65. Without characterizing such treatment as limited or lengthy, Dawson provided treatment to Thomas and her assessment offers understanding of Thomas's condition. Accordingly, the reasons ALJ Ziercher offers to limit the relevance of Dawson's findings lack sufficient support.

Dr. Anand's conclusions are also consistent with Dr. Gneiting's findings. Dr. Gneiting observed that Thomas had marked limitations in numerous functional areas including: performing within a schedule, maintaining regular attendance, performing at a consistent pace, and accepting instructions. *Id.* at 373–74. Dr. Gneiting also found Thomas was moderately limited in understanding and remembering instructions, maintaining attention and concentration, getting along with coworkers or peers. *Id.*

ALJ Ziercher gave little weight to Dr. Gneiting's findings because she, too, used a check-box form and because she did not define "marked" and "moderate" nor show she was familiar with how the Regulations define these terms. *Id.* at 24–25. However, there is no evidence that this provider was unfamiliar with Regulations and their definitions of these terms. ALJ Ziercher's assumption that Dr. Gneiting was uninformed as to the Social Security Administration's use of these terms is a conclusion lacking any basis of support. Additionally, as noted above, a provider's use of a check-box form alone does not render the information contained therein insignificant. ALJ Ziercher's reasons for discounting Dr. Gneiting's opinions therefore lack support.

Dr. Anand's opinion is also consistent with Thomas's statements. She testified that she was terminated from her job for irritability and poor judgement. *Id.* at 41–42. She reported difficulty concentrating, anxiety, and paranoia. *Id.* at 43. She rated her depression as a 9/10 with medication and rated her anxiety as 8/10 with medication. *Id.* at 45–46, 50. Thomas remarked

that she experiences manic behaviors. *Id.* at 44. She testified that she has difficulty completing tasks. *Id.* at 56–57. Thomas noted she experiences anxiousness around people she does not know and reported that she isolates herself. *Id.* at 50–51.

Finally, treatment records from Robertson and Drs. Godwin and Smith, as well as other health care providers, similarly reflect findings supporting Thomas's reported symptoms. *See id.* at 547–55, 794, 915–17.

In sum, the following §1527(c) factors weigh in favor of Dr. Anand's opinion. First, Dr. Anand examined Thomas on multiple occasions. At the time of his assessment, he had treated Thomas's mental health conditions every three weeks for approximately three months, and this treatment included mental status examinations, medication adjustments, observations of clinical signs, and Thomas's report of symptoms. Additionally, Dr. Anand's opinion is supported by his treatment notes which documented, for example, Thomas's mood, presentation, and thought processes. Dr. Anand's findings are also consistent with other evidence including the treatment notes and evaluations of Drs. Gneiting, Godwin, and Smith as well as Dawson, Seigel and Gavin. Finally, as a board certified psychiatrist, Dr. Anand's specialization is mental health.

While Thomas's condition appeared to improve beginning in October 2014, the weight of the medical record for the relevant time period consistently demonstrates significant findings regarding Thomas's mental health limitations. ALJ Ziercher's decision does not demonstrate that he appropriately considered the longitudinal record instead of emphasizing Thomas's recent improvement. Moreover, despite an apparent progress, Dr. Anand noted in January 2015 that Thomas continued to experience symptoms associated with her bipolar mania and PTSD including easy distractibility, irritability, restlessness, difficulty concentrating or thinking, and difficulty maintaining social relationships. *Id.* at 1173.

Although ALJ Ziercher stated that he would expect more episodes of decompensation if Thomas were as limited as Dr. Anand found, Dr. Anand's assessment opines that decompensation would result from a minimal increase in her mental demand or a change in her environment. *Id.* at 1174. As Thomas point out, ALJ Ziercher has not supported his conclusion that marked limitations found by Dr. Anand require evidence of additional decompensation in order to be credible.[6] *Id.* at 24.

ALJ Ziercher's evaluation of the medical evidence was improper because his proffered reasons for the weight he assigned to the medical opinions are flawed. For these reasons, remand is warranted.

### E.      Credibility

Thomas next contends that ALJ Ziercher erred in assessing her credibility. Specifically, she argues that the he improperly found that her significant limitations in activities of daily living could not be objectively verified and that the medical evidence did not support her allegations of her limitations. The Commissioner argues that ALJ Ziercher's credibility determination was proper. The undersigned finds that ALJ Ziercher erred in assessing Thomas's credibility.

There is a two-step process to determine whether a claimant is disabled by pain: (1) the ALJ must determine whether the claimant has a medical impairment "which could reasonably be expected to produce the pain or other symptoms alleged;" (2) if so, the ALJ must evaluate the intensity and persistence of the claimant's pain or symptoms and the extent to which it affects the claimant's ability to work. 20 C.F.R. §§ 416.929(c)(2). In evaluating the second prong, the ALJ cannot require objective evidence of the pain itself. *Craig* v. *Chater,* 76 F.3d 585, 592–93 (4th

---

[6] The Regulations define an episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 65 Fed. Reg. 50746, 50777.

Cir. 1996). However, objective medical evidence is a useful indicator in making reasonable conclusions about the intensity and persistence of the claimant's pain. SSR 96–7p, 1996 WL 374186, at *6.[7] Moreover, the ALJ must consider it in evaluating the individual's statements. *Id.*

The following is a nonexhaustive list of relevant factors the ALJ should consider in evaluating a claimant's symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication, received to relieve the symptoms; and (6) any measures the claimant has used to relieve the symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). A claimant's subjective statements of pain alone are insufficient to establish disability. *Mickles* v. *Shalala*, 29 F.3d 918, 919 (4th Cir. 1994).

The ALJ has full discretion to weigh the subjective statements with the objective medical evidence and other matters of record. *Craig*, 76 F.3d at 595 (holding that claimant's allegations of pain need not be accepted to extent that they are inconsistent with the record); *see also Hawley* v. *Colvin*, No. 5:12-cv-260-FL, 2013 WL 6184954, at *15 (E.D.N.C. Nov. 14, 2013) (ALJ need not accept claimant's claims at face value). In a district court's review, the ALJ's findings are entitled to great weight because of the ALJ's ability to observe and evaluate testimony firsthand. *Shively*, 739 F.2d at 989–90.

ALJ Ziercher found that Thomas was partially credible. Tr. at 22. ALJ Ziercher offered two reasons for his assessment: (1) Thomas's statements of her "limited daily activities cannot be

---

[7] Subsequent to the ALJ's decision, the Social Security Administration superseded SSR 96-7p with SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). The more recent Ruling eliminated the term "credibility" noting that "subjective symptom evaluation is not an examination of an individual's character[]" and directed that the determination "contain specific reasons for the weight given to the individual's symptoms[.]" *Id.* Because SSR 96-7p was in effect at the time the ALJ's decision, the undersigned will review the decision under SSR 96-7p. *See Keefer v. Colvin*, C/A No. 1:15-4738-SVH2016 WL 5539516, at *11 n.5 (D.S.C. Sept. 30, 2016).

objectively verified with any reasonable degree of certainty" and (2) even if she were so limited, "it is difficult to attribute that degree of limitation to the claimant's medical conditions, as opposed to other reasons[.]" *Id.* ALJ Ziercher erred in making such findings.

The Commissioner does not argue, nor is there any requirement, that a claimant's reported activities be verified with objective evidence in order to be credible. The Regulations simply state that a claimant's statements will be evaluated in relation to the objective medical evidence and other evidence. *See* 20 C.F.R. § 404.1529(c)(4) ("We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence . . . We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence[.]"). Thus, while a claimant need not produce objective evidence of how her symptoms limit her functioning, the available objective evidence can be used contradict or discredit her subjective claims. *Id. See also Mickles,* 29 F.3d at 921 ("There is no practical difference between requiring a claimant to prove pain through objective evidence and rejecting her subjective evidence because it is not corroborated by objective evidence.").

Moreover, the nature of activities of daily living suggest that objective verification may not be possible. *See Hyatt* v. *Sullivan*, 899 F.2d 329, 337 (4th Cir. 1990) ("Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree, or functional effect of pain is not determinative."); *Kendle* v. *Colvin*, No. 3:16-cv-27, 2016 WL 7337147, at *20 (N.D.W. Va. Nov. 30, 2016) ("[H]ow an ALJ would "verify" a plaintiff's daily activities is equally unclear."), *adopted by*, 2016 WL 7335638 (Dec. 16, 2016). Other courts have declined to affirm a credibility determination that required similar

proof where the credibility assessment lacked the support of substantial evidence. *Beardsley* v. *Colvin*, 758 F.3d 834, 837–38 (7th Cir. 2014); *Bonner* v. *Colvin*, No. 5:15-cv-03332, 2016 WL 4408831, at *17 (S.D.W. Va. Jul. 27, 2016); *Roxin* v. *Comm'r of Soc. Sec.*, No. SAG–14–2311, 2015 WL 3616889, at *3 (D. Md. June 5, 2015); *Holloway* v. *Astrue*, No. 8:10–1357-JFA-JDA, 2011 WL 1374885, at *11 (D.S.C. Mar. 30, 2011), *adopted by*, 2011 WL 1376884 (Apr. 12, 2011); *Mathews* v. *Astrue*, No. 09-cv-385-FHM, 2010 WL 3168104, at *2 (N.D. Okla. Aug. 10, 2010).

Language such as that ALJ Ziercher uses does not require remand where the the reasons for the credibility determination are otherwise adequately explained. *See Blackwell* v. *Colvin*, No. 1:14-CV-00085-MOC, 2014 WL 7339132, at *6 (W.D.N.C. Dec. 23, 2014) (ALJ's error that claimant's daily activities were not "objectively verifiable" was harmless error because his credibility determination was supported by other substantial evidence of record); *Baysden* v. *Colvin*, No. 4:12–CV–303–FL. 2014 WL 1056996, at *6–7 (E.D.N.C. Mar. 18, 2014). As discussed below, however, such relief is appropriate here given that ALJ Ziercher's credibility determination lacks the support of substantial evidence.

ALJ Ziercher concluded he could not attribute the alleged limitation to Thomas's medical conditions. Despite this statement, ALJ Ziercher found that Thomas's "medically determinable impairments could reasonably be expected to cause in general the alleged symptoms and limitations[.]" Tr. at 22. It is unclear how ALJ Ziercher determined that Thomas did have medical conditions that could reasonably be expected to cause the symptoms alleged, but at the same time, that the medical evidence discredited the symptoms alleged. What reasons, other than her medical condition, Thomas's symptoms may be attributed to are not identified by ALJ Ziercher. A review of the medical evidence demonstrates not only that such symptoms stem from

her medical conditions but also that such disorders are sufficiently severe that they could produce limitations to the degree she alleges. As noted above, Dr. Anand's assessment correlated Thomas continued mental health symptoms such easy distractibility, irritability, restlessness, difficulty concentrating or thinking, and difficulty maintaining social relationships to her bipolar disorder and PTSD. *Id.* at 1173. This basis for ALJ Ziercher's credibility finding is therefore unpersuasive.

For these reasons, ALJ Ziercher erred in concluding that Thomas was not fully credible. In light of Thomas's reported limitations in her daily activities, the consistent and persistent nature of her impairments, the continuing nature of her symptoms despite medications and mental health treatment, and the lack of inconsistent evidence in the record discrediting her allegations, ALJ Ziercher erred in evaluating her credibility. The credibility assessment cited minimal findings that fail to undermine her allegations or the other substantial evidence of record. Thus, remand for further consideration of this issue is appropriate.

## III. Conclusion

For the forgoing reasons, the court recommends that the court grant Thomas's Motion for Judgment on the Pleadings (D.E. 14), deny Berryhill's Motion for Judgment on the Pleadings (D.E. 16), and remand the matter to the Commissioner for further consideration.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel. Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject,

or modify the determinations in the Memorandum and Recommendation, receive further evidence, or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Owen* v. *Collins*, 766 F.2d 841, 846–47 (4th Cir. 1985).**

Dated: February 15, 2017

_____
Robert T. Numbers, II
United States Magistrate Judge